**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**DANA COLBERT,**

              **Plaintiff,**

     **v.**                              **Civil Action 2:17-cv-876
Judge James L. Graham
Magistrate Judge Jolson**

**COMMISIONER OF
SOCIAL SECURITY,**

              **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Dana Colbert, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **DENIED**, and that judgment be entered in favor of Defendant.

## I.      BACKGROUND

Plaintiff filed her application for SSI on November 27, 2012, alleging that she was disabled beginning October 3, 2012. (Tr. 331, PAGEID #: 373). Administrative Law Judge Jeffrey Hartranft (the "ALJ") held the hearing on February 16, 2017, after her application was denied initially and on reconsideration. (Tr. 157–93, PAGEID #: 196–232). The ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 10–29, PAGEID #: 49–68). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–3, PAGEID #: 40–42).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on October 5, 2017. (Doc. 1). Plaintiff filed her Statement of Errors on January 19, 2018 (Doc. 8),

Defendant filed an Opposition on March 15, 2018 (Doc. 9), and Plaintiff did not file a Reply. Thus, this matter is now ripe for consideration.

### A. Relevant Hearing Testimony

Plaintiff was born in 1982 (Tr. 169, PAGEID #: 208), and has a high school education (Tr. 172, PAGEID #: 211). She lives with her fiancé, who receives disability, and they do not have children. (Tr. 170–71, PAGEID #: 209–10). When asked to identify her fiancé's disabling condition, Plaintiff stated that she didn't know but generally "his health is bad, too." (Tr. 172, PAGEID #: 211). Plaintiff does not have a driver's license but uses public transportation and a Medicaid bus. (*Id.*).

Plaintiff testified that she has constant pain in both of her legs and left knee. (Tr. 177–78, PAGEID #: 216–17). Plaintiff explained that her left knee swells, so she elevates it and uses an ice pack at least once daily. (Tr. 179, PAGEID #: 218). Plaintiff stated that she had arthroscopic surgery on her left knee in June 2016, but it did not alleviate the pain. (Tr. 178, PAGEID #: 217). Plaintiff testified that she uses a cane for walking, although she did not have it with her on the day of the hearing. (Tr. 179, PAGEID #: 218). Plaintiff stated that she lies down the majority of the day and sometimes does dishes or "help[s] around the house," but her fiancé does the majority of the housework. (Tr. 174, 177, PAGEID #: 213, 216; *see also* Tr. 183, PAGEID #: 222 (stating that she rests "three quarters of the day")).

Plaintiff explained that she does not like to be around a lot of people and has difficulty with memory, concentration, and reading. (Tr. 182–83, PAGEID #: 221–22). Plaintiff watches soap operas but lacks the attention to watch a movie. (Tr. 183, PAGEID #: 222).

Vocational Expert Mark Pinti (the "VE") testified as an impartial witness. (Tr. 185, PAGEID #: 224). The ALJ asked the VE to identify any work for a hypothetical individual of

Plaintiff's age, education, and residual functional capacity ("RFC") with no relevant work history. (Tr. 184–85, PAGEID #: 223–24). The VE testified that the individual could perform light, unskilled jobs, such as housekeeper cleaner (300,000 jobs in the national economy), folder (50,000 jobs in the national economy), and packager (200,000 jobs in the national economy). (Tr. 185, PAGEID #: 224). On cross-examination, the VE stated that he assumed, based on the hypothetical, that the individual could maintain attention and concentration and possessed an ability to complete a normal workday or workweek. (Tr. 192, PAGEID #: 231).

**B. Relevant Medical Evidence**

Plaintiff alleges that she suffers from both physical and mental impairments. Consequently, the Court examines the relevant medical evidence pertaining to each.

*1. Physical Evidence*

Since being struck by vehicle as a pedestrian, Plaintiff has had difficulty with both of her legs. (Tr. 543, PAGEID #: 587; *see, e.g.*, Tr. 695, PAGEID #: 739 (radiology record showing right knee problems); Tr. 1014, PAGEID #: 1059 (radiology record showing a right knee joint effusion but no acute osseous abnormality); Tr. 778, PAGEID #: 822 (report of left leg pain); Tr. 769, PAGEID #: 813 (report of left knee "popping"); Tr. 544, PAGEID #: 588 (observation of "a little bit of a left-sided limp" but ambulation without assistive devices)). Plaintiff underwent surgery on her right leg in July 2001 (Tr. 655, PAGEID #: 699), and on her left knee in June 2016 (Tr. 1028, PAGEID #: 1073; *see also* Tr. 988, PAGEID #: 1033 (report of increased left knee pain in 2016, caused by her niece falling onto her leg)).

Prior to Plaintiff's left-knee surgery, consultative examiner Dr. Yaw Ayesu Offei, M.D. examined her on April 17, 2013. (Tr. 544, PAGEID #: 588). Dr. Offei's diagnoses included status post prior traumatic injury to the right leg, right leg pain, and depression that "appear[ed]

to be stable." (*Id*.). Dr. Offei opined that Plaintiff was capable of performing "light physical activity," but added that Plaintiff's "only challenge" would be in a position that required "continuous walking, pushing, [sic] lifting." (*Id*.).

The state agency reviewing physicians reviewed the record and completed physical residual functional capacity assessments in April and November 2013. (Tr. 209–11, 223–25, PAGEID #: 249–51, 263–65). The reviewers opined that Plaintiff could perform a reduced range of light work, including occasionally climbing ramps/stairs, never climbing ladders, ropes, or scaffolds, frequently stooping, kneeling, couching and crawling. (*Id*.). They further opined that Plaintiff was unlimited in her ability to balance and in her ability to be exposed to pulmonary irritants, but she should avoid even moderate exposure to hazards. (Tr. 210–11, 224–25, PAGEID #: 250–51, 264–65).

Shortly after Plaintiff's left knee surgery, consultative examiner Dr. Richard Fikes examined her in June 2016. (Tr. 827, PAGEID #: 871). Dr. Fikes's medical source statement provided, *inter alia*:

> [Plaintiff] indicates that she is able to walk approximately 1 to 1–1/2 city blocks with use of a walker or cane but does require rest and does experience fair to severe amounts of pain depending on the length of ambulation. She indicates that she is able to sit in an appropriate chair for approximately 2–3 hours without regular adjustment. She does believe she can stand for less than 30 minutes at a time before severe pain in her right hip occurs. She also indicates that she is currently under activity restrictions due to a recent surgical repair of her left ACL/PCL and meniscus by her orthopedist. She does believe she could lift a 10–20 pound weight from a standing position on a single and repetitive basis but does not believe she could lift greater than that.

(Tr. 828–29, PAGEID #: 872–73). Thus, Dr. Fikes opined that, "[a]t this point in time[,] [he] believe[d] the claimant could perform a sedentary to less than sedentary level of work." (Tr. 829, PAGEID #: 873).

Dr. Fikes also completed a check-box form. (Tr. 834, PAGEID #: 878). On that form,

Dr. Fikes opined that Plaintiff could lift and carry up to 20 pounds occasionally, sit for 4 hours, stand and walk for 2 hours, and required a cane to ambulate distances greater than 20 feet. (Tr. 834–35, PAGEID #: 878–79). Dr. Fikes also opined that Plaintiff could only frequently use her hands (as opposed to continuously), could only occasionally use her feet for foot controls, and was precluded from any postural activities. (Tr. 836–37, PAGEID #: 880–81). Finally, Dr. Fikes opined that Plaintiff was unable to ambulate without the use of a wheelchair, a walker, or 2 canes or 2 crutches. (Tr. 839, PAGEID #: 883).

Plaintiff began physical therapy in August 2016, approximately two months after Dr. Fikes's examination. She was noted to have impairments in her gait, locomotion, balance, coordination, muscle performance, joint integrity, mobility, and range of motion. (Tr. 1048, PAGEID #: 1093). In September 2016, Plaintiff was "able to perform with instruction and cueing, on 1 crutch, however when ambulating in [the] clinic she revert[ed] back to poor mechanics." (Tr. 1056, PAGEID #: 1101). Plaintiff did not have increased knee pain during exercise, but she reported muscle soreness and quick fatigue. (*Id.*). Plaintiff was "encouraged to walk without crutches" and was reminded that "muscle soreness will occur during the rehabilitation process." (Tr. 1062, PAGEID #: 1107). Plaintiff was reported to be "progressing" toward her physical therapy goals. (Tr. 1063, PAGEID #: 1108; *see, e.g.*, *id.* (noting that with verbal cueing Plaintiff demonstrated "improvements in knee extension strength with progression of exercises" and "improved balance")).

At a surgical follow-up also in September 2016, Plaintiff reported that physical therapy was helping with her range of motion but not her pain. (Tr. 1057, PAGEID #: 1102). She was advised to wean off crutches and engage in full-weight bearing as tolerated. (Tr. 1058, PAGEID #: 1103).

By October 2016, Plaintiff reported "improved strengthening and balance while ambulating around the house without crutches." (Tr. 1065, PAGEID #: 1110). She used one crutch to go up and down the stairs, and noted "a difference when performing exercises more consistently." (*Id.*; *see also* Tr. 1067, PAGEID #: 1112 (noting Plaintiff reported "feeling more confident while ambulating the stairs" and continued strengthening with home exercises)). Plaintiff "present[ed] to therapy with much improved [left] knee extension while ambulating, increased quadriceps strength, and improved [neuromuscular] control when ambulating." (Tr. 1066, PAGEID #: 1111). Plaintiff also "ambulate[d] with a symmetrical gait, was able to perform 2x10 [straight leg raises] without extensor lag, and demonstrate[d] strong quad contraction with superior patellar glide." (*Id.*).

However, Plaintiff demonstrated difficulty maintaining straight leg balance without frequent contact with a table for support and had increased postural sway with balance exercises. (Tr. 1068, PAGEID #: 1113). She also continued to report fatigue with exercises, and her assessment reflected the need "to improve muscular strength and endurance of quadriceps muscle for improved ambulation for longer periods of time." (*Id.*).

Five months after her surgery, in November 2016, Plaintiff was reported to be "doing better." (Tr. 1077, PAGEID #: 1122). She still had pain but did not require narcotic medication and continued to work on her quad strength. (*Id.*). Plaintiff reported back to physical therapy in early December 2016, "after a month of non-attendance." (Tr. 1079, PAGEID #: 1124). Plaintiff again reported fatigue and soreness, and it was observed that her "continued weakness … [was] likely related to [her] non-compliance with attendance of formal PT…." (Tr. 1081, PAGEID #: 1126).

By the end of December 2016, Plaintiff continued to report problems navigating the stairs, but her "[s]trength ha[d] improved in the quad as demonstrated by the progression of exercises with emphasis on single-leg including bridging as well as increased resistance with leg extension and leg press." (Tr. 1083, PAGEID #: 1128). Additionally, Plaintiff "made improvements with single-leg balance and ha[d] progressed to unstable surfaces." (*Id*.; *see also* Tr. 1085, PAGEID #: 1130 (noting that Plaintiff was "able to maintain single-leg balance for 30 seconds on an unstable surface")).

In January 2017, it was noted that Plaintiff needed to navigate "2 flights of stairs in order to do laundry." (Tr. 1086, PAGEID #: 1131). Plaintiff reported that she was "currently able to do it on her own if she has to," although she often had help with household chores. (*Id*.). Plaintiff continued to have difficulty with pain and strength in certain areas, but her "[b]alance continue[d] to make notable improvements." (Tr. 1087, PAGEID #: 1132). Generally, Plaintiff demonstrated "improvements" but she still had "great difficulty with straight leg balance on unstable surfaces…." (Tr. 1091, PAGEID #: 1136).

### 2. Mental Evidence

The state agency consultants found, *inter alia*, that Plaintiff was limited in maintaining concentration and attention and in her ability to complete a normal workday or workweek. (Tr. 212, 226, PAGEID #: 252, 266). When prompted to provide a narrative of their various findings, the state agency consultants explained that Plaintiff would be limited to "simple and some complex familiar tasks," but she would be able "to sustain concentration and persistence to perform simple and some complex tasks that are not fast paced." (Tr. 212–13, 226, PAGEID #: 252–53, 266). The state agency consultants likewise determined that Plaintiff would be limited to occasional, superficial interactions with others and that she may have difficulty responding to

changes due to her history of substance abuse. (Tr. 213, 227, PAGEID #: 253, 267). Thus, the state agency consultants opined that Plaintiff was able to perform work-related tasks "in an environment where duties are relatively static and changes can be explained." (*Id.*).

## C. ALJ's Decision

The ALJ found that Plaintiff had not engaged in substantial gainful activity since October 3, 2012, the application date. (Tr. 13, PAGEID #: 52). The ALJ determined that Plaintiff suffered from the severe impairments of "history of right femur fracture, requiring surgical intervention with hardware placement and subsequent hardware removal; asthma/chronic obstructive pulmonary disease (COPD); degenerative joint disease of the left knee, including arthritis and ACL tear requiring surgical intervention; degenerative joint disease with arthritis of the right knee; a depressive disorder; and a history of alcohol dependence (20 C.F.R. 416.920(c))." (Tr. 13, PAGEID #: 52). However, none of the impairments alone or in combination met or equaled a listed impairment. (Tr. 15, PAGEID #: 54).

The ALJ determined that Plaintiff retained the residual functional capacity to:

> [p]erform light work as defined in 20 CFR 416.967(b) except the claimant should avoid workplace hazards, including unprotected heights and machinery. She should occasionally climb ramps and stairs, but would be precluded from climbing ladders, ropes, and scaffolds. She could frequently balance and stoop and occasionally kneel, crouch, and crawl. The claimant should avoid exposure to concentrated pulmonary irritants such as fumes, odors, dusts, and gases. The claimant should perform simple, routine, repetitive tasks involving only simple work related decisions with few, if any, workplace changes in a setting without strict production quotas or fast paced work, such as on an assembly line. The claimant should have occasional interaction with the general public, coworkers, and supervisors.

(Tr. 16–17, PAGEID #: 55–56). The ALJ found that "a careful review of the record does not document sufficient objective medical evidence to substantiate the severity of the pain and degree of functional limitations alleged by the claimant." (Tr. 22, PAGEID #: 61; *see also* Tr.

24, PAGEID #: 63 ("Although the information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless such statements suggest the information provided by the claimant is not generally supported by the objective evidentiary record.")).

In weighing the opinion evidence, the ALJ afforded "some weight" to consultative examiner Dr. Offei's opinion because it was "consistent with the totality of the evidentiary record." (Tr. 24, PAGEID #: 63). The ALJ agreed with Dr. Offei that Plaintiff is capable of performing light work. (Tr. 25, PAGEID #: 64). Specifically, the ALJ found that Plaintiff's right femur surgery, left knee surgery, bilateral knee degeneration and arthritis, and asthma supported Dr. Offei's limitations to light level lifting, carrying, sitting, standing, and walking. (Tr. 24, PAGEID #: 63). The ALJ also considered that Plaintiff was gaining improvement in her lower extremity strength and balance through physical therapy. (*Id.* (citing Exhibits 11F/12F)). However, the ALJ found that Plaintiff's post-surgical intermittent balance deficits, asthma, and COPD warranted additional postural and environmental limitations beyond those given by Dr. Offei. (*Id.*). For this reason, the ALJ "overall [found] the claimant would be more limited than [Dr. Offei] suggest[ed]…." (Tr. 24–25, PAGEID #: 63–64).

The ALJ likewise gave "some weight" to the state agency consultants' physical assessments. (Tr. 26, PAGEID #: 65 (citing Exhibit 4A and 6A)). The ALJ gave "significant weight" to the portion of their opinion that Plaintiff was capable of performing light work, which the ALJ found "consistent with the totality of the evidence of record." (*Id.*; *see also id.* ("The record is generally consistent with lifting and carrying up to 20 pounds, even her treating physician after surgery indicated that claimant could lift within light level exertional work parameters.")). The ALJ disagreed, however, with their opinions that Plaintiff had an unlimited ability to balance at that time, although Plaintiff showed subsequent improvement in physical

therapy. (*Id.* (citing Exhibits 11F and 12F)). The ALJ also disagreed with their opinions concerning hazards and exposure to pulmonary irritants, finding that Plaintiff required further limitations based upon her conditions. (Tr. 26–27, PAGEID #: 65–66). Thus, overall, the ALJ found Plaintiff required "further limitations, but assesse[d] some weight to the consultants' physical statements." (Tr. 27, PAGEID #: 66).

The ALJ again gave "some weight" to Dr. Fikes's June 2016 opinion. (Tr. 25, PAGEID #: 64). In particular, the ALJ assigned "greater weight" to Dr. Fikes's opinion that Plaintiff should be limited to lifting and carrying 20 pounds consistent with light work, but "less weight to the remaining functional limitations" because "they were assessed during the claimant's left [knee] surgery recovery period." (*Id.*). The ALJ explained that "[w]hile the limitations during this time may have been relevant, the physical therapy notes within subsequent exhibits in 11F and 12F document with formal therapy treatment, the claimant was making physical progress, increasing lower extremity strength and balance." (Tr. 25–26, PAGEID #: 64–65).

The ALJ further noted "some inconsistencies between [Dr. Fikes's] provided functional capacity and the subsequent check boxes he noted at the end of his functional form." (Tr. 26, PAGEID #: 65). Speaking generally, the ALJ found the record demonstrated that Plaintiff "was able to balance and such functioning was improving with treatment." (*Id.*). The ALJ elaborated that Dr. Fikes assessed that Plaintiff needed a wheelchair, walker, or two crutches, but the record reflected that Plaintiff was able to switch her free hand to carry objects. (*Id.*; *see also id.* (noting that Plaintiff was provided two crutches initially; however, she "did not require the devices indefinitely")). (*Id.*). The ALJ likewise noted that Plaintiff testified to using a cane only intermittently, and she did not require a cane to attend the hearing. (*Id.*). The ALJ also determined that, contrary to Dr. Fikes's opinion, Plaintiff "showed no deficits to her hands that

would have resulted in a need to reduce her to only frequent use of the hands for manipulative activities." (*Id*.). Finally, the ALJ found that that, although the record supported "some postural and environmental limitations," it did not support the "elimination/preclusion of all such activities." (*Id*.).

As to Plaintiff's mental abilities, the ALJ assigned "some weight" to the state agency consultants' mental assessments. (Tr. 26, PAGEID #: 65 (citing Exhibits 4A and 6A)). Specifically, the ALJ assigned "significant weight to the notion that the claimant continues to have severe depressive disorders and a history of alcohol abuse, resulting in moderate mental limitations." (*Id*.). However, the ALJ:

> [m]odified the moderate limitations found in the functional capacity to contain vocationally relevant terms that show the claimant would be limited in the type of tasks that she could perform; that indicate she would have difficulty with adaptation in the work setting, requiring limited changes in the work setting and limitations on production quotas and fast paced work.

(*Id*.). "Therefore, overall, the [ALJ] afford[ed] the consultants' mental assessments some weight." (*Id*.).

Because Plaintiff had no past relevant work, transferability of job skills was not material to the ALJ's determination. (Tr. 27, PAGEID #: 66). The ALJ observed that Plaintiff is a high school graduate who speaks English and was 30 years of age (a younger individual) on the date she filed the application. (*Id*.). Considering Plaintiff's age, education, work experience, and RFC, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform. (*Id*.). Relying on the VE's testimony, the ALJ determined that Plaintiff could perform jobs such as housekeeping cleaner, folder, and packager. (Tr. 28, PAGEID #: 67). Consequently, the ALJ found that Plaintiff has not been under a disability, as defined in the Social Security Act, since October 3, 2012, the date the application was filed. (*Id*.)

11

## II.      STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III.      DISCUSSION

Plaintiff sets forth two statements of error. (*See* Doc. 8). In her first statement of error, Plaintiff argues that the ALJ's RFC determination is unsupported by substantial evidence because he failed to weigh the opinion evidence properly. (*Id*. at 6–11). In the second statement of error, Plaintiff asserts that the ALJ erred by relying on "internally inconsistent opinions" by the state agency psychological consultants. (*Id*. at 12). As explained below, however, Plaintiff's actual argument in the second statement of error is different; specifically, Plaintiff argues that the ALJ erred by failing to account for all of her moderate limitations in the RFC and the hypothetical to the VE. (*Id*.).

**A. Opinion Evidence**

Plaintiff argues first that the ALJ improperly relied on the use of a check-box form and physical therapy notes to discredit examining physician Dr. Fikes's opinion. (Doc. 8 at 8, 10). Plaintiff argues next that the ALJ erred in failing to weigh Dr. Fikes's opinion more heavily than the opinions of the state agency consultants and Dr. Offei. (*Id*. at 6). Plaintiff claims that Dr. Fikes, unlike the other physicians, was aware of all of her severe impairments and provided the most accurate assessment of her functional abilities. (*Id*.). Finally, Plaintiff contends that Dr. Fikes's opinion was entitled to greater weight because it was most recent and based on a more developed record. (*Id*.). For the reasons that follow, this Court disagrees.

*1. Check-Box Form and Physical Therapy Notes*

The ALJ assigned "some weight" to Dr. Fikes's June 2016 opinion and explained why he weighed certain parts more heavily than others. For instance, the ALJ assigned "greater weight" to Dr. Fikes's opinion that Plaintiff should be limited to lifting and carrying 20 pounds consistent with light work, but "less weight to the remaining functional limitations" because "they were assessed during the claimant's left [knee] surgery recovery period." (Tr. 25, PAGEID #: 64).

The ALJ did not, as Plaintiff suggests, discredit Dr. Fikes's opinion because he used a check-box form. (*See* Doc. 8 at 8) ("The ALJ attempted to discredit Dr. Fikes's opinions by taking a passing shot at the form by which Dr. Fikes provided his limitations."). Rather, the ALJ noted that there were "some inconsistencies" in Dr. Fikes's opinion demonstrated by the boxes he checked at the end of the form and his functional capacity finding. (Tr. 26, PAGEID #: 65). The ALJ explained that, while the claimant used a cane and was able to use her free hand to carry objects, Dr. Fikes assessed that she needed a wheelchair, a walker, or two crutches. (*Id*.). The ALJ also noted that Plaintiff was not required to use "the devices indefinitely" and relied on

Plaintiff's testimony that she used a cane intermittently and did not use a cane to attend her disability hearing. (*Id.*). Thus, the ALJ did not improperly rely on Dr. Fikes's use of a check-box form.

Similarly, the ALJ did not err in relying on the physical therapy notes to assign Dr. Fikes's opinion less weight. (*See* Doc. 8 at 10). Plaintiff admits that the notes refer to her progress but argues that "[s]imply because an individual is making 'progress' in physical therapy does not mean that they do not have limitations or are not disabled as the ALJ suggests." (*Id.*). Contrary to Plaintiff's argument, the ALJ did not use the physical therapy notes to find her free of limitations or impairments. Instead, the ALJ simply concluded the notes demonstrated progress subsequent to Dr. Fikes's examination during the surgical recovery period. (Tr. 25, PAGEID #: 64).

The ALJ acknowledged that the physical therapy notes contained some evidence favorable to Plaintiff. For example, the ALJ noted that:

> [t]he claimant reported some worsening left knee pain with activity and admitted she fell going up the stairs with two crutches. (Exhibit 11F). Physical therapy treatment notes showed she could complete the activities with cueing, but without cueing she reverted back to her poor body mechanics. (Exhibit 11F/4).

(Tr. 20, PAGEID #: 59). However, the ALJ found that overall the evidence was a mix of evidence both favorable and unfavorable to Plaintiff; for example:

> The claimant did not report acute knee pain with her activities during therapy, rather she reported muscle soreness and quick fatigue (Exhibit 11F/4). She reported trouble ambulating due to a fear of falling and difficulty balancing (Exhibit 11F/10). The claimant admitted with treatments she was doing better, but reported pain (Exhibit 11F/25). In January 2017, she was able to climb the stairs herself without help and with the therapy treatments her balance continued to make notable improvement (Exhibit 11F/35). She was able to complete her strengthening exercises with encouragement and consistent effort without increased pain (Exhibit 11F/37). The record . . . indicate[d] that she was making noticeable improvement (Exhibit 12F/33).

14

(*Id.*). Thus, the ALJ noted Plaintiff's reported symptoms such as fatigue but concluded that all of the evidence together demonstrated that physical therapy "increased her strength" and improved "physical activity after the left knee surgery." (*Id.*; *see, e.g.*, Tr. 1056, PAGEID #: 1101 (noting Plaintiff was able to ambulate on 1 crutch with instruction and cueing); Tr. 1057, PAGEID #: 1102 (stating that physical therapy is helping with range of motion); Tr. 1065, PAGEID #: 1110 (citing Plaintiff's report of "improved strengthening and balance while ambulating around the house without crutches" and observing "a difference when performing [home] exercises more consistently"); Tr. 1083, PAGEID #: 1128 (stating that "patient has made improvements with single-leg balance and has progressed to unstable surfaces"); Tr. 1087, PAGEID #: 1132 (finding that "balance continues to make notable improvements"); Tr. 1089, PAGEID #: 1134 (noting that Plaintiff was "able to complete strength training with encouragement to give good consistent effort and was able to complete without complaints of increased pain")).

Even if the physical therapy progress notes could be construed to support a different conclusion, Plaintiff fails to demonstrate that the decision falls outside the ALJ's "zone of choice." *See, e.g.*, *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (noting that "there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference"). Thus, the ALJ did not err in relying on Plaintiff's physical therapy notes.

### 2. Other Opinion Evidence

Turning to Plaintiff's next argument, the ALJ did not discredit Dr. Fikes's opinion "in favor of" the opinions of state agency consultants and Dr. Offei. (Doc. 8 at 7). In fact, the ALJ afforded each of those opinions "some weight," explaining that he weighed certain parts of their opinions more heavily than others based on the evidence as a whole.

Concerning the state agency consultants, the ALJ gave "significant weight" to their opinions that Plaintiff was capable of performing light work. (Tr. 26, PAGEID #: 65 ("The record is generally consistent with lifting and carrying up to 20 pounds, even her treating physician after surgery indicated that claimant could lift within light level exertional work parameters.")). The ALJ gave less weight to their opinions that Plaintiff had an unlimited ability to balance at that time, even if Plaintiff subsequently showed improvement in physical therapy. (*Id.* (citing Exhibits 11F and 12F)). The ALJ also assigned less weight to their opinions concerning hazards and exposure to pulmonary irritants, finding that Plaintiff required further limitations based upon her conditions. (Tr. 26–27, PAGEID #: 65–66). Consequently, the ALJ afforded some weight to the opinions but determined that Plaintiff required *further limitations*. (Tr. 27, PAGEID #: 66).

The ALJ made similar findings in weighing Dr. Offei's opinion. Specifically, the ALJ gave "some weight" to Dr. Offei's opinion, more heavily weighing the portion finding Plaintiff capable of performing light work. (Tr. 24–25, PAGEID #: 63–64 (finding that Plaintiff's right femur surgery, left knee surgery, bilateral knee degeneration and arthritis, and asthma supported the opined limitations on lifting, carrying, sitting, standing, and walking)). The ALJ again considered that Plaintiff was gaining improvement in her lower extremity strength and balance through physical therapy. (*Id.* (citing Exhibits 11F and 12F)). However, the ALJ determined that *additional postural and environmental limitations* were warranted based on Plaintiff's post-surgical intermittent balance deficits, asthma, and COPD. (Tr. 24, PAGEID #: 63). Accordingly, the ALJ found Plaintiff would be *more limited* than Dr. Offei's opinion suggested. (*Id.*).

Thus, the ALJ gave partial weight to the opinions of Dr. Fikes, the state agency

consultants, and Dr. Offei and explained his reasons for doing so based on the record evidence. Accordingly, the ALJ did not discredit Dr. Fikes's opinion "in favor of" the opinions of state agency consultants and Dr. Offei.

Finally, the ALJ did not err in affording weight to the opinions of state agency consultants and Dr. Offei, despite the fact that they were rendered earlier than Dr. Fikes's opinion. The Sixth Circuit has held that an ALJ may rely on opinions that were rendered before changes in a claimant's medical condition if the ALJ also considers subsequent assessments and takes into account those changes. *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009). The ALJ did so here by considering, *inter alia*, both Dr. Fikes's opinion and the detailed physical therapy notes following her left knee surgery. (*See supra*).

It is the ALJ's job to resolve inconsistencies in the opinion evidence. *See Goodson v. Chater*, No. 95-6582, 1996 WL 338663, at *1 (6th Cir. June 17, 1996). To be sure, there are cases in which an ALJ wholesale adopts medical opinions. In others, such as this case, the ALJ parses the opinions and assigns different weights to portions of them. It is not improper to do so. *See, e.g.*, *Gillespie v. Comm'r of Soc. Sec.*, No. 1:16-cv-226, 2016 WL 6802894, at *7 (W.D. Mich. Nov. 17, 2016) (rejecting Plaintiff's argument that "the ALJ could not parse out and give different weights to portions of the physicians' opinions, arguing that doing so would be in violation of the Sixth Circuit's holding in *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010")); *cf. Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) (holding that determination of no disability was warranted where "the ALJ's decision carefully parse[d] all of the medical records and accord[ed] them fair weight"); *Schulte v. Colvin*, No. 4:13-CV-01521, 2014 WL 1654129, at *5 (N.D. Ohio Apr. 24, 2014) (noting that an ALJ is not required to adopt every opinion expressed by a non-examining medical expert, even when an ALJ overall accords

that opinion great weight).  For all of these reasons, Plaintiff's first statement of error is without merit.

### B.  State Agency Consultants' Mental Assessments

Plaintiff argues next that the ALJ improperly relied on the state agency consultants' mental assessments.  In a heading in the Statement of Errors, Plaintiff argues that it was improper for the ALJ to rely on those opinions because they were "internally inconsistent." (Doc. 8 at 12).  Upon closer review, however, that isn't Plaintiff's argument at all.  Instead, Plaintiff argues that the ALJ erred by "failing to properly account for all of the moderate limitations" in the RFC and the hypothetical to the VE.  (Doc. 8 at 12–13).

Plaintiff's more specific point asserts that the ALJ failed to include in the hypothetical that she was "moderately limited" in the ability to maintain attention and concentration and to complete a normal workday and workweek without interruptions from psychological symptoms as determined by the state agency consultants.  (Doc. 8 at 12–13).  The state agency consultants indeed opined that Plaintiff was limited in maintaining concentration and attention and in her ability to complete a normal workday or workweek.  (Tr. 212, 226, PAGEID #: 252, 266).  However, when asked for a narrative of their findings, the state agency consultants explained that Plaintiff would be limited to "simple and some complex familiar tasks," but she would be able "to sustain concentration and persistence to perform simple and some complex tasks that are not fast paced." (Tr. 212–13, 226, PAGEID #: 252–53, 266).  The state agency consultants likewise determined that Plaintiff would be limited to occasional, superficial interactions with others and that she may have difficulty responding to changes due to her history of substance abuse.  (Tr. 213, 227, PAGEID #: 253, 267).  Thus, the state agency consultants opined that Plaintiff was

able to perform work-related tasks "in an environment where duties are relatively static and changes can be explained." (*Id*.).

Concerning Plaintiff's mental health, the ALJ found, *inter alia*, that the record "showed no active specialized mental health treatment" or "mental health medications." (Tr. 16, 20, PAGEID #: 55, 59 (noting that Plaintiff had never been prescribed mental health medications and was not in mental health treatment)). Nevertheless, the ALJ assigned "some weight" to the state agency consultants' mental assessments. (Tr. 26, PAGEID #: 65 (citing Exhibits 4A and 6A)). Specifically, the ALJ assigned "significant weight to the notion that the claimant continues to have severe depressive disorders and a history of alcohol abuse, resulting in moderate mental limitations." (*Id*.). However, the ALJ:

> [m]odified the moderate limitations found in the functional capacity to contain vocationally relevant terms that show the claimant would be limited in the type of tasks that she could perform; that indicate she would have difficulty with adaptation in the work setting, requiring limited changes in the work setting and limitations on production quotas and fast paced work.

(*Id*.). Therefore, overall, the ALJ afforded the consultants' mental assessments "some weight" because they were not stated in vocationally relevant terms. (*Id*.).

In modifying the moderate limitations to vocationally relevant terms, the ALJ formulated a mental RFC limiting Plaintiff to performing simple, routine, repetitive tasks involving only simple work-related decisions with few, if any, workplace changes in a setting without strict production quotas or fast paced work, such as on an assembly line. (Tr. 17, PAGEID #: 56). The RFC likewise limited Plaintiff to occasional interaction with the general public, coworkers, and supervisors. (*Id*.).

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x

149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). It is the ALJ, not a physician, who ultimately determines a claimant's RFC. 42 U.S.C. § 423(d)(5)(B); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ—not a physician—ultimately determines a claimant's RFC."). Indeed, an RFC determination is a legal decision rather than a medical one, and the development of a claimant's RFC is solely within the province of an ALJ. *See* 20 C.F.R. § 404.1527(e).

Here, the ALJ noted that Plaintiff was moderately limited in her ability to concentrate. (Tr. 15, PAGEID #: 54). He also acknowledged Plaintiff's daily activities despite this limitation, which included navigating through her community using public transportation, making independent purchases, paying bills, counting change, and watching television. (Tr. 16, 23 PAGEID #: 55, 62; *see, e.g.*, Tr. 548. PAGEID #: 592 (discussing Plaintiff's activities of daily living); Tr. 172, PAGEID #: 211 (Plaintiff's hearing testimony concerning her use of public transportation and shopping)). Nevertheless, the ALJ fashioned an RFC that properly addresses Plaintiff's moderate limitation in her ability to concentrate by limiting her to simple, routine, repetitive tasks involving only simple work-related decisions with few, if any, workplace changes. (Tr. 16–17, 21, PAGEID #: 55–56, 60); *see Gipson v. Comm'r of Soc. Sec.*, No. 5:16 CV 1108, 2017 WL 3732009, at *12 (N.D. Ohio Aug. 30, 2017) (holding that the ALJ's RFC limiting Plaintiff to simple, routine, repetitive tasks, requiring only simple work-related decisions, complied with the moderate limitations the agency psychiatrists placed on Plaintiff's abilities in concentration and pace).

Concerning Plaintiff's ability to complete a normal workday and workweek without interruptions from psychological symptoms, the ALJ expressly considered whether Plaintiff's impairments were so disabling as "to preclude all work activity on a continuing and regular

basis." (Tr. 22, PAGEID #: 61). However, the ALJ determined that "a careful review of the record [did] not document sufficient objective medical evidence to substantiate the … degree of functional limitations alleged by claimant." (*Id.*). Again, the ALJ examined Plaintiff's activities of daily living, and found they were "not restricted to the extent that she would be precluded from the range of work assessed" in his opinion. (Tr. 23, PAGEID #: 62). He also noted that Plaintiff made inconsistent statements—on the one hand representing that she "could not pay attention to a television show," and on the other acknowledging that "she was able to understand television." (Tr. 24, PAGEID #: 63). Thus, the ALJ did not find Plaintiff so limited that she would be unable to complete a normal workday and workweek without interruptions from psychological symptoms.

Based upon foregoing, the ALJ included the adopted limitations in the hypothetical to the VE. Nothing more was required. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 239, 241 (6th Cir. 2002) (explaining the pertinent requirement is that the hypothetical accurately portray all of a claimant's impairments); *see also Casey v. Sec'y of H.H.S.*, 987 F.2d 1230, 1235 (6th Cir. 1993) (requiring an ALJ to incorporate only accepted limitations in the hypothetical to the VE)). Although Plaintiff is seemingly arguing for more restrictive limitations, it was within the ALJ's purview to make a determination about Plaintiff's RFC based on the record as a whole. *See Buxton*, 246 F.3d at 773 (noting the ALJ's "zone of choice"). Taking all of the foregoing into account, the second statement of error is without merit.

## IV. CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **DENIED**, and that judgment be entered in favor of Defendant.

21

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:   April 12, 2018                                    /s/ Kimberly A. Jolson
                                                         KIMBERLY A. JOLSON
                                                         UNITED STATES MAGISTRATE JUDGE